Filed 3/4/16  P. v. Hernandez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067138 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. JCF31651) |
| LARRY HERNANDEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Imperial County, Jeffrey B. Jones, Judge.  Affirmed in part; reversed in part; remanded for resentencing.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Kristine A. Gutierrez and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Larry Hernandez of sexual battery by restraint (Pen. Code,[1] § 243.4, subd. (a); count 1); two counts of sexual penetration by foreign object by force, fear, or threats (§ 289, subd. (a)(1); counts 2 & 3); assault with the intent to commit sexual penetration by foreign object by force, fear, or threats (§ 220; count 4); and first degree burglary (§ 459; count 5). The jury also found true that Hernandez personally inflicted great bodily injury on the victim as to counts 2 and 3 (§§ 12022.7, 12022.8), Hernandez committed counts 2, 3, and 4 during the commission of first degree burglary, and a person was present who was not Hernandez's accomplice when he committed count 5.

The superior court sentenced Hernandez to prison for a total term of 60 years to life, which consisted of two consecutive terms of 25 years to life for counts 2 and 3, with consecutive 10-year terms for the great bodily injury enhancements. The court stayed the sentences on the remaining counts.

Hernandez appeals, contending: (1) the trial court erred in allowing a witness to testify then striking his testimony after finding him incompetent; (2) substantial evidence does not support the great bodily injury enhancement as to count 2; (3) his conviction for count 5 must be reversed because it was a lesser included offense of counts 2, 3, and 4; (4) his sentence for count 5 must be stricken as it was used as a circumstance to impose one strike sentencing as to counts 2 and 3; (5) the trial court erred in instructing the jury on assault with the intent to commit penetration with a foreign object under section 220;

---

[1] Statutory references are to the Penal Code unless otherwise specified.

2

(6) his sentence on count 1 must run concurrently with his other sentences because the court did not make a determination of consecutive versus concurrent sentences; (7) the abstract of judgment requires correction because Hernandez was not convicted of attempted forcible sexual penetration by foreign object in count 4 as stated in the abstract; and (8) this court should conduct an independent review of the transcript of the in camera hearing in conjunction with Hernandez's motion for new trial.

The People correctly concede the validity of Hernandez's contention numbers three, five, and seven. As such, we agree with Hernandez that his convictions on counts 4 and 5 must be reversed.

In addition, without opposition from the People, we reviewed the sealed transcript from the in camera hearing and determine that the trial court did not fail to disclose discovery to Hernandez. We also conclude that the trial court did not err in allowing a witness to testify at trial, but then striking the witness's testimony after finding the witness incompetent.

However, we agree with Hernandez that substantial evidence does not support the great bodily injury enhancement in connection with count 2. As such, we affirm the judgment in part, reverse the judgment in part, and remand the matter to the superior court to resentence Hernandez consistent with this opinion.

FACTUAL BACKGROUND

Prosecution

In January 2013, 57-year-old D., lived alone in an apartment in El Centro. D. had been in a wheelchair for 10 years because of a degenerative muscular disease. On

3

January 12, 2013, around 3:00 a.m., D. was awakened by a loud noise. She got into her wheelchair, activated the burglar alarm, and wheeled herself toward the bedroom door. D. heard the sound of breaking glass coming from her living room. When she went to the front door, she saw that the window was broken. Hernandez was putting his hand through the window and was trying to unlock the door.

D. pushed Hernandez's hand away and attempted to close the door. When Hernandez kept pushing on the door, D. bit one of his right fingers. Nevertheless, Hernandez forced his way in. Hernandez asked D., "Don't you like dick?" D. yelled. Hernandez touched D.'s left breast and vagina over her clothing. He then put his hand inside her underwear and stuck at least one finger in her vagina.

D. tried to push Hernandez away from her. Hernandez hit D., knocking her out of her wheelchair. Hernandez threw D. to the ground and removed her pants. D. crossed her legs. Hernandez asked, "Aren't you ill?" and tossed her pants aside. Hernandez grabbed a glass candle holder from a nearby table and unsuccessfully attempted to insert it into D.'s anus.

Hernandez stepped outside, returned with a water bottle, rubbed it on D., and inserted the bottle head into D.'s vagina. The bottle cut D. on the interior of her vagina, and she started bleeding. D. cried and yelled for help. Hernandez opened the water bottle and emptied the water onto D.'s body. D. scratched Hernandez on his left cheek. Hernandez then left the apartment. D. rolled over, dragged herself to her wheelchair, wheeled herself to her bedroom, and telephoned her son.

4

Officers with the El Centro Police Department were dispatched to D.'s apartment in response to the alarm she activated. When they arrived, D. was inside her apartment. She was crying and in a great deal of pain. Her arms were covered with blood. Her pants and underwear were on the floor beside her. No one else was in the apartment.

When the officers looked around D.'s apartment, they found two articles of clothing and a plastic water bottle by the front door. There was a clear broken glass stem on top of the table and red and clear pieces of glass as well as a broken red glass cup on the floor. The front window was broken and there was blood in the entryway. A blood trail led out the front door, down the sidewalk, and to the east of the apartment complex.

Officers Stephen Singh and Ascencion Felix went outside to search for suspects. They spotted Hernandez walking south, away from the apartment complex's south gate. Both officers yelled, "Police, stop." Hernandez kept walking. They yelled a couple more times, "Police, stop," but Hernandez ignored them. Hernandez tried to open the gate to the apartments. When Hernandez discovered the gate was locked, Hernandez continued to walk away from the officers. Hernandez made a motion with his hand and tossed a broken clear vase and stem, and a red glass cup, over a fence near the apartments. Singh ran up to Hernandez, grabbed his right arm, ordered him to stop, and pulled him to the ground. Singh kept ordering Hernandez to show the officers his hands. Hernandez tucked his hands into his chest. Singh pulled Hernandez's hands behind his back and placed him in handcuffs.

There was blood on Hernandez's face, around his wrists, and on his jeans. Singh asked Hernandez why he was walking away from the apartment complex. Hernandez did

5

not respond.  Singh asked Hernandez why he had blood on him.  Hernandez said he was jumped on the east side.  Hernandez stated he did not need medical attention.  Singh asked Hernandez who jumped him, and Hernandez answered that "West Siders" did.  Hernandez attempted to explain where he was jumped, but after Singh told him the location did not make sense, he provided a different location.

Officer Cory Gustafson went to Hernandez's location and attempted to place evidence bags on Hernandez's hands.  Hernandez opened and closed his hands, causing the bags to fall off.  Eventually, Gustafson was able to secure the bags to Hernandez's hands with medical tape.

Paramedics arrived at D.'s apartment to transport D. to the hospital.  On the way, she was taken to the location where Hernandez had been detained.  A standard admonishment was read to her.  When police shined their spotlight on Hernandez, D. said, "Yes, that's him."  However, D. was subsequently unable to identify Hernandez in a live lineup, but did identify him in court at trial.

D. was taken to the hospital for a sexual assault examination.  When she arrived, she had bloodstains on her bra and shirt.  There were multiple bruises on her arms and legs.  She had abrasions and bruising below her left breast, on her left cheekbone, and on her lower lip.  Some of her teeth were loose.

A genital examination revealed multiple abrasions and tenderness to the inguinal fold.  There were large purple bruises on her genital and anal areas.  Her labia, urethra, and cervix were bruised and bleeding.  D. had a severe laceration in her vaginal and perineum area, which required sutures.

6

A sexual assault exam also was performed on Hernandez. There were injuries on his right hand. The nurse swabbed Hernandez's hands, genital areas, and mouth for DNA.

Detectives Aaron Messick and Dorian Meneses interviewed Hernandez at the police station around 7:00 a.m. on January 12, 2013. Hernandez waived his *Miranda* rights and agreed to make a statement. Hernandez told the detectives that he went to a bar called the Rat Cellar, then to another bar called the Tavern, where he met up with a friend. He decided to go to his friend's house. He was walking southbound on Fifth Street when some men showed up and followed him. They got into a fight. Hernandez jumped over a few fences, ended up on Hamilton, and was stopped by the police.

Messick asked Hernandez for the friend's name, but Hernandez refused to provide it. Messick asked Hernandez if the men following him had hit him. Hernandez said they hit him in the head. Hernandez added that there were three men. He would not tell Messick who they were because it would not be "in [his] best interests." However, Hernandez stated that they hit him with a piece of metal or a stick, he ran away, they chased after him, and he was stopped by the police.

Messick told Hernandez that one of the arresting officers saw him throw something red as he ran, and asked Hernandez what he threw. Hernandez denied throwing anything. Asked if he hid in someone's house, Hernandez said no, he just ran. He ran through a house but was not holding a red object. He jumped over a few fences and crossed through some apartments. When he exited, he was placed under arrest.

7

Messick urged Hernandez to tell the truth, and asked him why he broke into D.'s apartment. Hernandez told Messick he did not break into an apartment, he passed by the apartment and went over the fence. Asked, "Why did you do it?," Hernandez responded, "Why did I do what? The truth is I owed some money." When Messick asked Hernandez who he owed money to, Hernandez said, "To dudes from West Side." Hernandez refused to give Messick the names of the "dudes." Messick asked Hernandez, "Is that why you broke into the apartment?" Hernandez responded, "What apartment?" Hernandez claimed he ran through a couple of apartments but did not have time to break into them.

Hernandez then told Messick he went into an apartment, but he was "pretty wasted." A friend of Hernandez's broke the window and entered first. Hernandez heard screaming, so he followed. D. was on the floor. Hernandez grabbed an object to hit his friend, then changed his mind and ran out. An alarm went off and his friend left.

Messick asked Hernandez what happened while he was in the apartment. Hernandez told Messick that he saw D. on the floor. Hernandez's friend was "all over her." Hernandez picked up an object so he could hit the friend. He decided against it, left, and was stopped by the police. Asked how he broke the window, Hernandez insisted he did not, saying the door was open and he went inside. Messick asked Hernandez how he got blood on his sweatshirt. Hernandez said he did not know. Asked again, Hernandez said the blood was from his fight with West Side gang members.

Before the fight, Hernandez's friend said, "Let's make some money." The friend broke D.'s window. Hernandez waited outside as a lookout. He heard screaming, went

8

in, and prepared to hit the friend. He did not and instead ran out. He did not hurt D. and the blood was not hers. He had no idea where it came from.

Messick asked Hernandez how long he and his friend had known each other. Hernandez said they had been acquaintances for a while, then claimed people would come after him if he provided police with the friend's name. Hernandez added that the friend lived on Hamilton, a couple of houses down from D. Asked what the friend looked like, Hernandez responded that he was "skinny, a tweaker." Messick told Hernandez he needed a name or a street name. Hernandez refused, saying he did not want to be killed in jail or on the street. Finally, Hernandez said his friend's nickname was "Chino" and he was 24 years old.

Messick again asked Hernandez, "Why did you do it?" He responded that he needed money. He then elaborated that Chino broke D.'s window and went in. Hernandez paced back and forth outside. He heard screams and walked inside. D. was on the floor. Chino was leaning over her. Hernandez grabbed an object to hit Chino, decided not to, and walked out. Hernandez stated that no one was supposed to be home and denied raping D.

After the interview, Meneses went to the address on Hamilton where Hernandez said Chino lived. A woman named Yesenia Orozco was outside. Orozco told Meneses that Chino was her son, Gabriel Ortiz. She added that he was not living at the residence and had not been there for about a month. Instead, Ortiz had been staying with his aunt in El Monte at the time the crimes were committed.

9

Elias Valencia, a criminalist with the Department of Justice laboratory in Riverside, examined items of evidence collected in this case. Valencia explained that he followed the procedures outlined in the lab's technical manual, including precautions to prevent contamination.

Valencia selected items for DNA analysis. From D.'s sexual assault exam kit, he selected a saliva reference sample, fingernail scrapings, samples from her left and right breasts, and samples from her neck. From Hernandez's sexual assault exam kit, he selected samples from his left second and fourth fingers, saliva reference samples, and fingernail scrapings.

Valencia looked at the bags used on Hernandez's right hand. The interior bag was torn and the exterior bag was sealed. Stains on the interior bag tested positive for blood. There also was blood on the interior bag used on Hernandez's left hand. Valencia cut out some samples from the bag and stored them.

Valencia examined the plastic water bottle collected from D.'s apartment. It had no lid and was empty. Valencia saw white residue and a possible hair near the lid. He collected the hair, swabbed the residue, and packaged the hair and swab for DNA analysis.

Valencia noted several stains on Hernandez's sweatshirts with most of the stains on the cuffs. The stains tested positive for blood. Valencia collected a stained piece of toilet paper, which was in the right front pocket of the sweatshirt. He also collected hairs he found near the bottom of the hem.

10

Valencia examined the broken candle holder found in D.'s apartment. There were blood stains on the stem and on the base. The items tested negative for feces.

Marla Richardson, another analyst with the Riverside laboratory, conducted the DNA testing on evidence collected by Valencia. Richardson stated that she followed the proper protocol to prevent contamination of the evidence.

Richardson determined that the candle cup holder contained a mixture of DNA from two or more persons. D. was the major female donor. There was a minor trace from an unknown male. Because Richardson did not have enough DNA for comparison, she sent the sample to the Department of Justice laboratory in Richmond for further testing.

Hernandez was the minor donor from the fingernail scrapings on his left hand, while D. was the major donor. There was a substantial amount of DNA, which was unusual. D. and Hernandez were equal donors to DNA taken from Hernandez's right hand fingernail scrapings.

The swab from the bottom of the water bottle contained DNA from at least two people. D. was the major female donor. There was very little DNA from the second person. The red brown stains on the water bottle were consistent with a single source, D. Hernandez was excluded as a donor.

Hernandez was the major donor to the bloodstain from the interior brown paper bag placed on his hand. There was not enough information to determine the minor donor.

Richardson ran control samples, her work was reviewed, and there was no indication of contamination. However, when she analyzed D.'s control sample, she

11

detected a trace amount of male DNA, which indicated it had been contaminated. As such, Richardson sent the sample to the laboratory in Richmond for further analysis.

Meghan Gray, a senior criminalist with the Department of Justice laboratory in Richmond, performed more sophisticated testing on D.'s reference sample. She tested it against DNA from Riverside laboratory employees, Hernandez, Gabriel Ortiz,[2] and the emergency room physician who treated D. It did not match any of these individuals.

Defense

Hernandez testified at trial in his defense. He stated that on the evening of the crimes, he had been out drinking with some friends. He met up with a friend named Alan Fuentes. They walked to Circle K to buy some beer, then proceeded to Fuentes's house across the street. It was about 3:00 a.m. As Hernandez and Fuentes were outside drinking beer, three or four people showed up and a fight ensued. Hernandez ran away and cut through some apartments. Hernandez ended up on Hamilton and decided to see if Gabriel Ortiz was awake. He had known Ortiz about two years. Ortiz was outside smoking a cigarette and acting strange. Ortiz mentioned the possibility of breaking into an empty house. Hernandez agreed to accompany Ortiz.

While Ortiz went inside D.'s apartment complex, Hernandez stood across the street acting as a lookout. Hernandez heard glass shatter and then about a minute or so later he heard an alarm go off. He walked toward the apartments and as he came closer he saw an apartment door semiopened. Hernandez pushed the door open with his foot and saw

---

[2]     Hernandez claimed Ortiz assaulted D.

Ortiz standing over a woman. The woman was on her stomach and Hernandez could see her bare legs. The woman was crying and screaming. Hernandez grabbed an object off a table as he came into the apartment because he saw what was happening and his first instinct was to hit Ortiz. He did not see Ortiz do anything to the woman. He was inside her apartment maybe 25 to 30 seconds. Wanting no trouble, Hernandez ran. Realizing his fingerprints were on the object he grabbed, he took the object with him.

Ortiz came outside. Hernandez was mad because he thought no one was going to be at home and swung at Ortiz. Ortiz grabbed his arms. Hernandez heard police cars coming and left walking northbound out of the apartment complex through the front gate. He did not know where Ortiz went. He threw the candle holder inside of a fence.

After his arrest, he eventually admitted being involved in the burglary. Hernandez testified that he received a cut on his ear from his son. He believed the marks underneath his nose were from the fight he had been in earlier that night and that he got blood on his clothes when Ortiz grabbed him. He did not identify Ortiz right away because he did not want to be seen as a snitch. He denied assaulting D. and did not know Ortiz was going to attack her. He did not think anyone was inside the apartment. He was only interested in taking property from the apartment.

Suzanna Ryan, a private forensic DNA consultant, noted that D.'s reference sample was contaminated. She testified that although it is possible the source of the contamination was the gauze pad used to take the sample, the more likely source was the Riverside laboratory.

13

According to Ryan, the Department of Justice forensic manual recommends extracting evidence from a victim and suspect at different times or places. This guideline was not followed in the instant matter, in that the paper bags over Hernandez's hands were processed at the same time as the water bottle, and the cuff of his sweatshirt was processed during the same sequence as the red brown stain from the label on the water bottle. Ryan also testified that if a third party assaulted D., came into contact with Hernandez, and D.'s blood was transferred to Hernandez's sweatshirt, D.'s DNA might show up on a test even if Hernandez never touched her. Similarly, if that third party touched Hernandez's hands, D.'s DNA might appear under Hernandez's fingernails.

## DISCUSSION

### I

### *ORTIZ'S TRIAL TESTIMONY AND THE SUBSEQUENT STRIKING OF HIS TESTIMONY*

#### A. Hernandez's Contentions

At trial, Hernandez's primary theory of defense was third party culpability, namely that Ortiz was the perpetrator. Hernandez conceded he intended to commit a burglary at D.'s apartment, but testified that Ortiz actually broke in and assaulted D. Ortiz was called as a prosecution witness at trial. Ortiz appeared to be unable to answer even the simplest of questions and the trial court ultimately struck all of Ortiz's testimony and admonished the jury that it could not consider it, but informed each juror that he or she could consider his or her impression of Ortiz. Here, Hernandez contends his trial counsel provided

14

constitutionally ineffective counsel by failing to ask for a competency hearing before Ortiz testified at trial.

## B. Background

Before the prosecution called Ortiz as a witness at trial, the trial court questioned Ortiz outside of the presence of the jury to ascertain whether counsel needed to be appointed to represent him. During that questioning, the court told Ortiz that he would be testifying, and asked him if he was appearing voluntarily or received a subpoena. Ortiz did not respond. The court asked Ortiz again. In response, Ortiz shrugged his shoulders and said he did not know. The court asked him if someone came to his house and gave him a piece of paper. When Ortiz indicated the answer was no, the court advised him of his privilege against self-incrimination. Asked if he understood, Ortiz remained silent. The court told Ortiz several more times to answer, but Ortiz said nothing.

The court asked the prosecutor whether Ortiz had been subpoenaed, and the prosecutor explained that both sides had subpoenaed Ortiz. The prosecutor expressed doubt that Ortiz understood what was happening. She stated that he had an obvious cognitive disability, and it was difficult to talk with him or get him to understand.

The trial court asked Ortiz if he wanted an attorney. Ortiz said that he did. The court, however, asked Ortiz again if he wanted an attorney. Ortiz responded, "I don't — no trouble. Nothing gets me trouble." "No to everything or — or I don't know." Because it believed Ortiz seemed ambivalent, the court decided not to appoint him counsel.

Hernandez's trial counsel asked the court to appoint counsel. When questioned why he cared, Hernandez's trial counsel explained that his examination of Ortiz would be lengthy, and he did not "know how much information we're really going to get out of him at this point in time." He also explained that if counsel was appointed for Ortiz, that counsel would probably instruct him to invoke his Fifth Amendment right not to testify. The court told Hernandez's trial counsel that he had no standing to make the request. The court further noted that Ortiz spoke English and had not indicated he intended to assert his privilege against self-incrimination. There was no request at that time for a competency hearing as to Ortiz.

When Ortiz was called as a witness at trial, he proved difficult to place under oath. He refused to raise his hand to be sworn in. He said that he understood English, but seemed to request to be addressed in Spanish, stating: "I want to change to a different language so I don't have to do none of that." Finally, Ortiz agreed to raise his hand and when asked if he promised to tell the truth, he responded, "I guess."

The prosecutor then attempted to question him. It did not go smoothly. Ortiz was able to say his name, spell it, and provide his date of birth. However, when the prosecutor asked him where he lived, Ortiz did not provide a cogent answer:

"Q:    Okay. And where do you live right now?

"A:    I don't live -- I'm with my mom, but like I -- that's it. I don't
        know. I'm right here. I mean, I'm right here. . . . That's it."

The prosecutor later asked Ortiz if he knew Hernandez, to which Ortiz replied, "I don't know. No. I mean, I don't know." The prosecutor asked Ortiz if he broke "into a

16

lady's house," and Ortiz responded, "No. No. No." The prosecutor also asked Ortiz if he hurt a lady. Ortiz answered, "No. No. I don't know. I didn't know." Ortiz ended his testimony by stating that he did not accompany Hernandez and "go into a lady's house." However, throughout the prosecutor's direct examination of Hernandez, he would ask for questions in Spanish then change his mind and say that the questions could be in English. He also interjected during the prosecutor's questions, and asked, "Are you almost done already?"

Hernandez's trial counsel then attempted to cross-examine Ortiz. Ortiz did not respond to many of defense counsel's questions, including a simple question asking him whether he could see defense counsel. Ortiz provided a confusing response when defense counsel asked him if he could identify Hernandez at trial. After not responding to defense counsel's question if he knew Hernandez, Ortiz finally shook his head, but then said, "No. No. I didn't know. I don't have nothing to do with no one. No, I mean, I don't know. I don't want to -- I can't -- I mean, if I don't want Spanish, is she going -- going to finish asking me -- haven't I already finished?" Hernandez's trial counsel tried to ask Ortiz a few more questions, but when Ortiz appeared unable to respond coherently, defense counsel requested a sidebar and the cross-examination of Ortiz ceased.

Outside the presence of the jury, Hernandez's trial counsel requested that the trial court order Ortiz to undergo drug testing or another less intrusive examination to determine his sobriety. The court declined to do so because it did not believe it had jurisdiction to order such a test. Nevertheless, the court noted that Ortiz was acting bizarrely.

17

Hernandez's trial counsel subsequently continued his cross-examination, and after Ortiz testified that he never lived with his mother, he refused to answer multiple questions.

The trial court called the parties into chambers. While in chambers, the court stated:

> "We are on the record in chambers. [Hernandez's trial counsel's] attempt to look at the document, he [Ortiz] looked straight ahead. Asked if it was his photograph, shrugging shoulders, shaking head in a rapid fashion. [¶] At this time I'm persuaded Mr. Ortiz is not competent to testify. He cannot relay information well enough for the trier of fact to arrive – furthermore, he already testified sort of as to a couple of things. It's all very ambivalent, defense has to have an opportunity for cross-examination if his testimony is going to be considered by jury. [¶] I'm absolutely persuaded he is not being intentionally evasive, not being devious. I don't believe he is under the influence of a controlled substance. I think he is, in fact, he needs to be under the influence of some sort of psychotic – psychotropic medication. [¶] If this were and [sic] LPS3 conservatorship, he would be on conservatorship based on the way he is testifying. [¶] [Prosecutor], I'm sorry. On my own motion I'm going to strike the testimony of Mr. Ortiz and direct the jurors not to consider it for any purpose."

Hernandez's trial counsel argued:

> "Your Honor, let me just say it's very difficult to unring the bell. I didn't think he should take [the] witness stand in the first place based on what my investigator had told me about his contacts with Mr. Ortiz. Now it seems to be the prosecution has gotten the benefit of putting him on the witness stand and getting his appropriate denials that he ever assaulted any woman at this point in time. And it's going to be difficult to tell jurors to disregard that at this point in time."

The trial court observed that it had no other alternative. It noted that there were no challenges to Ortiz's competency before Ortiz appeared as a witness at trial. The court

18

emphasized that Hernandez's trial counsel was being gentle with Ortiz, but Ortiz was "staring off into space." The court told defense counsel that he "could spend all afternoon [cross-examining Ortiz] and I don't think you would get anything useful out of him." The court therefore told the attorneys that it was going to strike Ortiz's testimony, but the jury could consider its observation of Ortiz.

When trial resumed, the court excused Ortiz as a witness and explained to the jury:

> "Ladies and gentlemen, I'm going to give you an admonishment at this time. And I'll give you the reason for the admonishment, the ruling the Court has made. [¶] In order to be what we call competent as a witness, a person must understand the obligation to tell the truth, which I think Mr. Ortiz did cover that, but they must also be capable of relating useful information to the trier of fact, which would be you in this case. Having observed Mr. Ortiz testify today, I'm satisfied he does not meet [the] second prong; that is, he is not capable of relating information well enough or reliable enough that a trier of fact cannot reasonably rely on to reach a conclusion. [¶] So at this point I'm going to strike Mr. Ortiz's testimony. You are not to consider it for any purpose or for the truth – I should say for the truth of the matters he stated in his testimony to the extent that he stated anything plainly. [¶] You may consider, of course, his physical appearance, his demeanor, his manner, mannerisms, that sort thing [sic], that would be appropriate. That's not testimonial in nature. But as to content of his testimony, you are not to consider it for any purpose. [¶] Again, I make the finding that Mr. Ortiz is not competent to testify. And this is unfortunate, but that is the way it is."

## C. Analysis

Here, Hernandez contends that his trial counsel was prejudicially ineffective because he failed to request a competency hearing prior to Ortiz appearing as a witness at trial. He notes that his primary defense was that Ortiz assaulted D. and Ortiz's appearance and testimony at trial eviscerated his defense.

19

To show that trial counsel's performance was constitutionally defective, an appellant must prove: (1) counsel's performance fell below the standard of reasonableness, and (2) the "deficient performance prejudiced the defense." (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 (*Strickland*).) Competency is presumed unless the record affirmatively excludes a rational basis for trial counsel's choice. (*People v. Ray* (1996) 13 Cal.4th 313, 349; *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260.) We reverse on the ground of inadequate assistance on appeal only if the record affirmatively discloses no rational tactical purpose for counsel's act or omission. (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437 (*Lucas*); see *Ray*, *supra*, at p. 349.)

Hernandez's claim of ineffective counsel arises from his trial counsel's failure to request a competency hearing as to Ortiz. However, we generally defer to the tactical decisions of trial counsel. (See *People v. Scott* (1997) 15 Cal.4th 1188, 1212; *People v. Holt* (1997) 15 Cal.4th 619, 703.) "[T]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " (*Lucas*, *supra*, 12 Cal.4th at p. 437, quoting *Strickland*, *supra*, 466 U.S. at p. 689.)

Hernandez insists that it was "inexplicable" that his trial counsel did not request the court to make a preliminary finding of Ortiz's competency, and as such, his trial counsel's representation of Hernandez fell below the appropriate standard of reasonableness. To this end, Hernandez points out that his trial counsel should have been on notice for the need of a competency hearing. For example, at trial, Meneses testified

that, in her experience talking to Ortiz, Ortiz would struggle to answer simple questions.[3] Ortiz's mother testified that Ortiz had some sort of disability. In addition, Hernandez notes that, prior to Ortiz being called as a witness at trial, the court examined him outside the presence of the jury, and "it was rather patently clear Ortiz was a problem witness." Indeed, in the middle of the court's discussion with Ortiz, the prosecutor commented that she had "grave doubt" about Ortiz's competency.

Against the background, Hernandez essentially argues that his trial counsel had to realize that a competency hearing was necessary, especially considering that Hernandez's primary defense theory was that Ortiz actually attacked the victim. We are not persuaded. Although we agree with Hernandez that his trial strategy was to argue that Ortiz assaulted D., we cannot say with any kind of certainty that Hernandez's trial attorney had no strategic reason for having Ortiz testify without first moving for a competency hearing. Indeed, until Ortiz actually did testify, the record supports the inference that Hernandez's trial attorney wanted Ortiz to testify at trial.

Hernandez's trial attorney objected to Meneses's testimony to the extent she was offering an opinion as to Ortiz's cognitive ability. Further, in cross-examining Meneses, Hernandez's trial attorney tried to frame Ortiz's inconsistent answers to Meneses's

---

[3]     Here, Hernandez characterizes Meneses's testimony as stating that Ortiz had "cognitive problems." However, Hernandez's trial attorney objected to multiple attempts from the prosecutor to elicit testimony from Meneses that Ortiz had cognitive problems, and after one such objection, the court admonished the jury not to consider Meneses's opinion regarding Ortiz's cognitive state, but merely to consider Meneses's testimony of her interactions with Ortiz as a possible explanation of Meneses's investigation of the crimes in the instant matter.

questions as evidence that Ortiz was lying to the detective, and as such, Meneses's investigation of the subject crimes was lackluster because she did not more aggressively pursue Ortiz as a suspect. Also, after the court questioned Ortiz outside the presence of the jury, asking him if he had been subpoenaed and whether he would like counsel appointed, and the prosecutor expressed her doubts that Ortiz could understand what was going on, Hernandez's trial counsel pushed for the court to appoint Ortiz counsel. Further, defense counsel emphasized that he anticipated that there would be a "lengthy examination" of Ortiz "based upon his behavior before the Court just now." Hernandez's trial counsel even expressed doubt regarding how productive any examination of Ortiz would prove: "And I don't know how much information we're really going to get out of him at this point in time." The court agreed, but stated that it did not know how an appointed attorney would help the attorneys elicit more information from Ortiz when he testified. Hernandez's trial attorney countered by arguing that if Ortiz had an attorney, that attorney would "probably advise him that he has this right and he should exercise it. That would probably be my advice to him if I was representing him based upon representations that were made with the Court right now. So for that reason, that's why I'm asking for the appointment." In other words, Hernandez's trial attorney wanted the court to appoint counsel for Ortiz so that counsel would advise Ortiz to take the Fifth Amendment and refuse to testify at trial. Defense counsel appears to have made the tactical decision to have Ortiz appear as a witness at trial only to take the Fifth Amendment. Ortiz could not do so if the court found him to be incompetent prior to trial.

Accordingly, the record supports at least a plausible strategic reason for defense counsel not to challenge Ortiz's competency.

Only after Ortiz proved to be a difficult witness for both the prosecution and the defense at trial did Hernandez's trial counsel state that he did not believe Ortiz should have taken the stand in the first place. Based on the cold record before us, defense counsel's comments are made with the benefit of hindsight. This is not sufficient to render implausible the possibility that Hernandez's trial counsel made the strategic decision that Ortiz should be called as a witness at trial.

Further, even we were to assume that Hernandez's trial counsel's representation of Hernandez fell below the applicable reasonable standard, we conclude that Hernandez has not shown that he was prejudiced by his counsel's actions. (See *Strickland*, *supra*, 466 U.S. at pp. 687-688.) After the court determined that Ortiz was incapable of testifying, it advised jurors that they could not consider his testimony for any purpose. We presume jurors followed the instruction and did not base their decision on the stricken testimony. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1005.)

Moreover, although the court allowed jurors to consider Ortiz's demeanor while he was testifying, they heard other testimony that Ortiz struggled to answer simple questions. For example, Meneses testified that when she spoke to Ortiz on September 15, 2014, Ortiz gave various statements and conflicting responses. Meneses explained:

> "Probably the easiest way to illustrate this is to provide an example
> of his -- the way he answers would be, say, simple question would
> be if he is wearing a black shirt, within that same answer he could
> say, yes, yes, no, yes, no, and you can see just -- I can see, not you, I
> can see that he is having problems with his thought process in

23

answering just that simple question. It's like that with him whenever you ask him any other questions. Again, I have seen this throughout my interactions with Mr. Ortiz in the past as well. That's what I meant by cognitive issues. It's something you can't really fake."

Additionally, during closing argument, defense counsel commented about Ortiz's demeanor at trial. He told jurors that if Hernandez were responsible for the sexual assault, he would have taken the water bottle with him and disposed of it. Hernandez's demeanor on the stand, counsel argued, showed he was a rational and intelligent person; and disposal of the evidence is what a rational person would do. Ortiz, however, would not think this way, "because he seemed to be a fairly irrational person by most people's standards." Hernandez's trial counsel also reminded jurors that Ortiz's behavior "was strange and bizarre by any standards." He told the jury that Ortiz was "putting on an act" to get out of court, was under the influence of drugs, or was mentally ill. In any case, defense counsel argued that Ortiz's behavior was suspect. Hernandez's trial counsel suggested to the jury, "Would you feel safe sitting next to Gabriel Ortiz? I sure wouldn't."

In addition, the evidence of Hernandez's guilt was mountainous. When D. saw Hernandez at a curbside line up, she immediately yelled, "That's him." D. said she was 100 percent sure Hernandez was the person who attacked her. D. also identified Hernandez in court. The police saw Hernandez near D.'s apartment shortly after the crimes were committed. Hernandez matched the description D. had given of her assailant.

24

When the police saw Hernandez near D.'s apartment complex, they ordered Hernandez to stop, but he kept walking. He had blood on his face, around his wrists, and on his clothes. Hernandez refused to tell the officers what he was doing in the area. Asked why he was bloody, Hernandez claimed some gang members jumped him near two intersecting streets that were actually parallel to each other. When the inconsistency was pointed out to Hernandez, he named a different location. Hernandez attempted to prevent officers from bagging his hands for evidence. Before Hernandez was detained, he tossed the candle holder he used in the assault over a fence. Hernandez had injuries to his hands and face consistent with a struggle with the victim. D.'s DNA was found on fingernail scrapings taken from Hernandez's hands and from blood found on Hernandez's sweatshirt. In talking to the police, Hernandez changed his story about what he was doing on the night in question. It was not until the end of the interview that he even mentioned that Chino (Ortiz) had attacked D. At trial, Hernandez offered yet additional detail about what occurred on the night in question providing another version of events.

In comparison, other than Hernandez's suggestion that Ortiz assaulted D., there is no indication in the record that Ortiz was involved in the subject crimes. D. gave a statement to the police and testified at trial, and never wavered from her account that only one person - Hernandez - was in her apartment that night. Ortiz's DNA was not on any of the items of the evidence or on the victim, and he was not at the scene that night. And, Ortiz's mother told police, and repeated at trial, that Ortiz was in Los Angeles County at the time the crimes were committed.

In summary, there was no prejudice to Hernandez and his ineffective assistance of counsel claim therefore must fail. (*People v. Gray* (2005) 37 Ca1.4th 168, 209.)

## II

### *GREAT BODILY INJURY IN CONNNECTION WITH COUNT 2*

Hernandez was charged with two great bodily injury enhancements with respect to counts 2 and 3. The verdict forms provided to the jury indicated that count 2 involved digital (fingers) penetration and count 3 involved penetration with a water bottle. The jury made true findings of great bodily harm as to both these counts. And the superior court sentenced Hernandez, among other terms, to two consecutive five-year terms on counts 2 and 3. Hernandez contends that the great bodily injury enhancement as to count 2 is not supported by sufficient evidence. We agree.

We apply a substantial evidence standard of review to assess the sufficiency of the evidence. We review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence–that is, evidence that is reasonable, credible, and of solid value–from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.) We presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) We ask whether, after viewing the evidence in the light most favorable to the judgment, any rational trier of fact could have found the allegations to be true beyond a reasonable doubt. (See *Jackson v. Virginia* (1979) 443 U.S. 307, 319.)

26

Section 12022.8 provides, in pertinent part:

> "Any person who inflicts great bodily injury . . . on any victim in a violation of [specified sex offenses] . . . shall receive a five-year enhancement for each violation in addition to the sentence provided for the felony conviction."

For purposes of this section, great bodily injury "means a significant or substantial physical injury." (*People v. Escobar* (1992) 3 Cal.44th 740, 749-750; § 12022.7, subd. (f).) The fact that the injury is significant or substantial "is commonly established by evidence of the severity of the victim's physical injury, the resulting pain, or the medical care required to treat or repair the injury." (*People v. Cross* (2008) 45 Cal.4th 58, 66.) The determination of "whether a victim has suffered physical harm amounting to great bodily injury is not a question of law for the court but a factual inquiry to be resolved by the jury." (*Id*. at p. 64.)

To receive the enhancement, the defendant must be the direct, not just the proximate, cause of the victim's injuries. (*People v. Martinez* (2014) 226 Cal.App.4th 1169, 1184-1185.) However, "neither the application of physical force, nor affirmative action by the defendant is necessarily required." (*People v. Elder* (2014) 227 Cal.App.4th 411, 420 [victim injured while struggling to escape from defendant's assault].)

The People emphasize that strong evidence was presented at trial of D.'s injuries. They are correct, but the People overlook that the evidence of D.'s injuries was never linked to Hernandez's digital penetration of D.

At trial, D. appeared unsure if Hernandez digitally penetrated her. The prosecutor asked D. if she felt Hernandez's fingers go into her vagina. D. responded, "I don't recall." After moving on to other areas of inquiry, the prosecutor again asked, "[D]o you remember [Hernandez] placing his fingers inside your vagina?" D. again replied, "No." D. did testify that she remembered telling officers right after the crimes were committed that Hernandez digitally penetrated her. However, when the prosecutor further explored the digital penetration issue, D.'s answers were ambiguous whether there was actual penetration or if Hernandez only touched her vagina under her underwear.

D.'s testimony was vague as to whether Hernandez digitally penetrated her vagina, but the prosecutor attempted to clarify the issue by stating to D., "Okay, so he did penetrate, okay." After this question was objected to by defense counsel and stricken, the prosecutor asked, "So you stated he penetrated your vagina," at which point a defense objection was again sustained.

On cross-examination, D. testified that Hernandez stuck his hand in her pants and touched her vagina and penetrated it possibly with one finger. In addition, the prosecution offered testimony from Felix that D. told Felix that Hernandez had "entered her vagina with his fingers."

Clearly, this evidence is sufficient to support the jury's verdict as to count 2. Nevertheless, we struggle to see the connection between D.'s injuries and Hernandez's digital penetration of D.'s vagina. We observe that there was substantial evidence of D.'s injuries. At the scene of the crime, D. was covered with blood. She had to go to the hospital where a sexual assault examination revealed significant injuries. Her labia was

28

bleeding.  D. had a severe laceration in the vaginal and perineum region that required stitches.  D. had bruising on her labia, urethra, and cervix.  Here, however, the People do not link these injuries with any evidence in the record showing they were caused by Hernandez digitally penetrating D.'s vagina.  Instead, they merely argue, "When the defendant commits more than one specified sex offense resulting in great bodily injury, the defendant is subject to a separate five year enhancement for each offense."  (See *People v. McElrath* (1985) 175 Cal.App.3d 178, 188-190.)  The People's argument assumes that the digital penetration caused the injuries, but they fail to support their position with appropriate citation to the record.

In comparison to her testimony about whether Hernandez digitally penetrated her vagina, D. was very clear that she experienced pain when Hernandez penetrated her vagina with a water bottle.  She agreed that Hernandez cut her vagina with the water bottle, she felt warm liquid after being penetrated by the water bottle, and she experienced pain when Hernandez inserted the water bottle in her.  D. later reiterated that Hernandez had "hurt [her] with [the water bottle] and he poured the water onto my body."  The prosecutor later returned to the water bottle and asked D. another question to clarify her testimony:

> "Q.   Now, when I showed you the picture of your panties on the ground and the water bottle next to it, and I believe you stated that he scratched you with the water bottle, could you explain what you mean by 'scratched you'?
>
> "A.   He cut me.  He cut my vagina.
>
> "Q.   Okay.

29

"A.    At the hospital I had six stitches.

"Q.    When you say your vagina, do you mean inside your vagina?

"A.    Inside.  Inside."

Thus, D.'s trial testimony was consistent and unambiguous about the cause of her injuries.  Hernandez had hurt her vagina when he penetrated it with a water bottle.  In contrast, she did not testify as to any pain she experienced from Hernandez penetrating her vagina with his finger or fingers.  Moreover, Dr. Donald Bennett testified that D.'s injuries were consistent with an object being forced into the vagina "most likely multiple times."  The People do not point to any portion of record where evidence was offered that showed that D.'s injuries were attributable to Hernandez digitally penetrating D.'s vagina.

In short, the People have not shown where in the record there was any evidence that Hernandez caused D. great bodily harm when he digitally penetrated her vagina, let alone substantial evidence to support the jury's true finding as to this enhancement.

III

*COUNT 5*

Hernandez argues, and the People correctly concede, his conviction under count 5 (burglary) must be reversed because it is a lesser included offense of counts 2 and 3.  "In California, a single act or course of conduct by a defendant can lead to convictions 'of any number of the offenses charged.' [Citations.]  But a judicially created exception to this rule prohibits multiple convictions based on necessarily included offenses."  (*People v. Montoya* (2004) 33 Ca1.4th 1031, 1034; italics omitted.)

30

To determine whether one offense is necessarily included in another, courts use one of two tests -- the " 'elements' " test or the " 'accusatory pleading' " test.  (*People v. Lopez* (1998) 19 Ca1.4th 282, 288.)  Under the elements test, if a crime cannot be committed without also necessarily committing the lesser offense, the latter is a lesser included offense within the former.  (*People v. Birks (*1998) 19 Ca1.4th 108, 117 (*Birks*).)  Under the accusatory pleading test, the court looks to whether the accusatory pleading describes the greater offense in a way that the defendant, if guilty, must necessarily have also committed the lesser crime.  (*People v. Moon* (2005) 37 Ca1.4th 1, 25-26.)

In *People v. Reed* (2006) 38 Cal.4th 1224 (*Reed*), our high court held that dual convictions are barred only when the statutory elements of the greater offense include all of the statutory elements of the lesser offense.  (*Id*. at pp. 1227, 1230-1231.)  When a charged crime is a lesser included offense to another charged crime only by virtue of the language of the accusatory pleading, the remedy is to stay the sentence for the lesser crime under section 654.  (*Reed, supra,* at pp. 1226-1227.)  Subsequently, in *People v. Sloan* (2007) 42 Ca1.4th 110, the California Supreme Court held that enhancement allegations are not to be considered when determining whether one offense is included in another.  (*Id.* at pp. 113-123.)

Here, the One Strike law required the jury to find that Hernandez committed counts 2 and 3 during the commission of a first degree burglary.  (See § 667.61, subd. (d)(4).)  Under count 5, the jury convicted Hernandez of first degree burglary.  The rule excluding enhancements is inapplicable because the One Strike law is not an enhancement but rather, an alternate penalty scheme, which applies when certain

31

conditions have been met. (See *People v. Brookfield* (2009) 47 Ca1.4th 583, 591; *People v. Jones* (2009) 47 Cal.4th 566, 576.) Accordingly, Hernandez's conviction under count 5 is reversed, and the six-year stayed term on that count must be stricken.[4]

IV

*COUNT 4*

Hernandez next argues, and the People concede, that the trial court prejudicially erred by instructing the jury on assault with intent to commit penetration with a foreign object under section 220 because that offense was not a lesser included offense of forcible penetration with a foreign object under section 289, subdivision (a)(1)(A). We agree.

In count 4, Hernandez was charged with forcible sexual penetration. At the close of the prosecution's case, Hernandez's trial counsel moved, under section 1118.1, to dismiss the charge, arguing there was insufficient evidence of penetration to support it. The court agreed, noting that D. had testified that her anus was never penetrated, and there was no physical evidence to support the charge. Accordingly, the court granted the motion. However, the court observed the charge had several lesser included offenses, specifically, assault with intent to commit sexual penetration, sexual battery, and simple battery. The prosecutor stated that the jury could also be instructed on an attempt.

---

4      Because we reverse Hernandez's conviction under count 5, we do not reach his alternative argument that his sentence for count 5 must be stricken because it was used as a circumstance to impose One Strike sentences as to counts 2 and 3.

During the jury instruction conference, Hernandez's trial counsel objected to any instruction on assault with intent to commit sexual battery, arguing that it was not a lesser included offense of sexual penetration by a foreign object. Defense counsel argued that while force was required to commit the assaultive crime, it was not necessary for a violation of section 289. The court disagreed, stating that if there was any sexual penetration, then it was necessarily forceful. Defense counsel responded that the crime could also be committed by threats to the victim or to another person. Therefore, the instruction was not proper. The prosecutor disagreed and asked the court to give it.

After taking a short break to research the issue, the court told the parties it was persuaded that assault with the intent to commit forcible sexual penetration was a lesser included offense. Hernandez's trial counsel objected again, arguing that an element was missing. Specifically, defense counsel noted that the greater crime could be committed by use of threats, while the lesser could not. The court responded that the second element, penetration, was required for both crimes, and that itself constituted sufficient force to make the crime an assault. Therefore, the court stated, it would instruct on a violation of section 220 as a lesser included offense of count 4. The jury subsequently convicted Hernandez of that crime.

Here, Hernandez maintains that assault with the intent to commit forcible sexual penetration is not a lesser included offense of forcible sexual penetration. He is correct.

Section 289, subdivision (a)(1)(A) is violated when "an act of sexual penetration . . . is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person . . . ."

33

Section 220, subdivision (b) is violated when any person "assaults another with intent to commit rape, sodomy, oral copulation, or any violation of . . . [section] 289." (§ 220, subd. (b).) Section 240 defines assault as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." Here, applying the elements test (see *Birks, supra,* 19 Ca1.4th at p. 117) illustrates that section 220, subdivision (b) is not a lesser included of section 289, subdivision (a)(1)(A).

Section 289, subdivision (k)(1) defines sexual penetration as "the act of causing the penetration, however slight, of the genital or anal opening of any person or causing another person to so penetrate the defendant's or another person's genital or anal opening for the purpose of sexual arousal, gratification, or abuse by any foreign object, substance, instrument, or device, or by any unknown object." A violation of section 289, subdivision (a)(1)(A) can occur if the defendant penetrates or forces another person to penetrate the defendant or another's genital or anal opening. However, an assault as defined in section 240 is "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." Therefore, under section 240, the defendant is the one who must attempt to commit the injury on the victim. However, under section 289, subdivision (a)(1)(A), the recipient of the sexual penetration could be the defendant, while under section 220, the recipient of the sexual penetration must be the victim and the perpetrator must be the defendant.

Moreover, section 289, subdivision (a)(1)(A) can be committed without an "unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) In contrast, such an assault is required under section 220.

34

(See e.g., *People v. Leal* (2009) 180 Cal.App.4th 782, 793 [assault requires force while sexual penetration may not].)  Section 289, subdivision (a)(1)(A) prohibits sexual penetration not only by force and violence, but also by the use of duress, menace or fear against the victim or another person.  Thus, under section 289, subdivision (a)(1)(A), the defendant may use verbal and psychological threats rather than threats of violent injury to coerce the victim into sexual penetration.  (See *People v. Senior* (1992) 3 Cal.App.4th 765, 774 [violation of section 289, subdivision (a) occurred where defendant exerted duress against daughter in the form of psychological coercion such as threats to break up the family unit].)  But to violate section 220, the defendant must have committed an assault, which, here, requires an attempt plus an ability to commit a violent injury. (§ 240.)  Therefore, under the statutory elements test, section 220, subdivision (b) is not a lesser included crime of section 289, subdivision (a)(1)(A).  At best, under the circumstances here, it could be considered a lesser related offense.  Yet, even if we determine that it is a lesser related offense, the court erred in providing the challenge instruction.

In *Birks*, *supra*, 19 Cal.4th 108, the court held that although a trial court is required to instruct on lesser included offenses, instructions on lesser related offenses are not to be given over an objection.  (*Id.* at pp. 112-113, 137.)  There is no duty to instruct even if the lesser related offense is supported by the evidence and the defendant waives his due process notice rights.  (*Id*. at pp. 112, 129-131.)  The court added, "[O]ur decision does not foreclose the parties from agreeing that the defendant may be convicted of a lesser offense not necessarily included in the original charge."  (*Id*. at p. 136, fn. 19.)

35

Here, there was no agreement. Hernandez's trial counsel specifically objected to an instruction on assault with the intent to commit sexual penetration. Accordingly, under *Birks*, the court erred in providing the subject jury instruction, and the jury's verdict on the lesser related offense to count 4 must be reversed.[5]

IV

*HERNANDEZ'S SENTENCE FOR COUNT 1*

Hernandez next contends his sentence under count 1 must run concurrently because the trial court did not make a determination regarding whether that sentence should run consecutively or concurrently. We disagree.

As the People note, the court stated that it was sentencing Hernandez on count 1 to "one-third the midterm, which is one year[.]" One-third the midterm is authorized only when consecutive sentences are imposed. (§ 1170.1, subd. (a).) The court treated the sentence for count 1 as the subordinate term to the principal term of six years on count 5. As such, from the context of the court's sentencing of Hernandez, it is clear that the court intended to have Hernandez's sentence for count 1 run consecutively.

However, as Hernandez points out, we are reversing Hernandez's conviction under count 5. Therefore, the principal term of six years for count 5 no longer exists and the sentence for count 1 can no longer be the subordinate term. We thus remand the matter

---

[5]     Hernandez also argues that the abstract of judgment must be modified to accurately set forth the jury's verdict, specifically noting that the abstract does not correctly reflect the jury's verdict as to count 4. Because we are reversing Hernandez's conviction under count 4, we need not reach this issue as the superior court will prepare a new abstract of judgment as required by this opinion.

back to the superior court to resentence Hernandez on count 1 consistent with this opinion.

V

*THE MOTION FOR NEW TRIAL*

After the jury's verdicts, Hernandez filed a motion for a new trial based on newly discovered evidence. In the motion, Hernandez's trial counsel stated that after trial, he learned D. visited the Sure Helpline Rape/Crisis Center (Sure Helpline). While there, she told a worker named Rosa Estrada that more than one person assaulted her. After counsel was provided with this information, his investigator interviewed Estrada, who confirmed that there was such a discussion. If so, he argued, this was material evidence indicating Ortiz was involved in the attack.

Although the prosecution opposed Hernandez's motion and argued, among other things, that documents created when D. used Sure Helpline's services were privileged, the superior court determined that good cause existed to examine the Sure Helpline documents (which Hernandez had subpoenaed). After reviewing the subject documents in camera outside the presence of the parties, the court stated that the records contained a single entry related to the charged offenses and did not indicate another person was present. Accordingly, the court denied the motion for a new trial.

Here, Hernandez requests that this court review the sealed record to ascertain whether any information was incorrectly withheld. The People do not oppose Hernandez's request. We have reviewed the sealed transcript of the in camera hearing where the superior court examined the Sure Helpline records. We also have reviewed the

37

actual Sure Helpline records.  We agree with the superior court.  There was no discoverable information bearing on Hernandez's guilt or innocence contained in the documents.  Therefore, we are satisfied the court did not abuse its discretion in denying Hernandez's motion for a new trial.

## DISPOSITION

The judgment is reversed as to the jury's verdict on counts 4 and 5 as well as the jury's finding of great bodily injury in connection with count 2.  In all other aspects, we affirm the judgment.  We remand the matter back to the superior court to resentence Hernandez consistent with this opinion and prepare a new abstract of judgment correctly reflecting Hernandez's sentence.


HUFFMAN, Acting P. J.

WE CONCUR:


HALLER, J.


McDONALD, J.


38